AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20)    ☐ Original    ☐ Duplicate Original

| LODGED<br>CLERK, U.S. DISTRICT COURT<br><br>11/06/2020<br><br>CENTRAL DISTRICT OF CALIFORNIA<br>BY: ____DM____ DEPUTY |
|---|

# UNITED STATES DISTRICT COURT
for the
Central District of California

| FILED<br>CLERK, U.S. DISTRICT COURT<br><br>November 6, 2020<br><br>CENTRAL DISTRICT OF CALIFORNIA<br>BY: ____IM____ DEPUTY |
|---|

United States of America

v.

Cesar Castillo-Pena,

Defendant(s)

Case No.  2:20-mj-05397

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of November 5, 2020, in the county of Los Angeles in the Central District of California, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841(a)(1) | Possession with Intent to Distribute a Controlled Substance |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

*Complainant's signature*

Michael Johnson, Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: **November 6, 2020**

*Patricia Donahue*
*Judge's signature*

City and state:  Los Angeles, California

Patricia Donahue U.S. Magistrate Judge
*Printed name and title*

**AFFIDAVIT**

I, Michael Johnson, being duly sworn, declare and state as follows:

## I. PURPOSE OF AFFIDAVIT

1. This affidavit is made in support of a criminal complaint against Cesar CASTILLO-PENA ("CASTILLO-PENA") for a violation of 21 U.S.C. § 841(a)(1): Possession with Intent to Distribute a Controlled Substance.

2. This affidavit is also made in support of an application for a warrant to search the following digital devices in the custody of the United States Drug Enforcement Administration ("DEA"), in Ventura, California, (collectively, the "SUBJECT DEVICES") as described more fully in Attachment A:

   a. A blue Samsung phone with a cracked back ("SUBJECT DEVICE 1"); and

   b. A black Motorola phone ("SUBJECT DEVICE 2").

3. The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of 21 U.S.C. §§ 841(a)(1) (possession with intent to distribute controlled substances) and 846 (conspiracy and attempt to distribute controlled substances) and 924(c) (possession of a firearm in furtherance of a drug trafficking crime) (the "Subject Offenses"), as described more fully in Attachment B. Attachments A and B are incorporated herein by reference.

4. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and

witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and search warrant, and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. BACKGROUND OF AFFIANT

5. I am a Special Agent with the DEA and have been so employed since 2018. My current assignment is the Ventura Resident Office. Prior to my current assignment, I attended the DEA Academy in Quantico, VA, for approximately four months. Prior to my employment with the DEA, I was an Infantry and Intelligence Officer in the United States Army for approximately six years.

6. I have received several hundred hours of training in various investigative techniques, including specialized training in the recognition and processing of controlled substance identification, the methods and means of narcotics violators, narcotics packaging, narcotics paraphernalia and terminology, narcotics prices, field testing of narcotics, interview and interrogation techniques, surveillance techniques, undercover operations, confidential source management, and the effects of controlled substances on abusers.

7. During my employment with DEA, I have participated in drug investigations as both a case agent and in a supportive role. I have assisted in the arrest of multiple drug

2

traffickers as a result of these investigations. I have witnessed and assisted other officers and agents interview informants and suspects concerning the methods and means of drug traffickers. I have participated in several static and mobile surveillance activities and have assisted in the execution of multiple search warrants.

8. Through my training, education, and experience, I am familiar with identifying illegal drugs, the methods narcotics traffickers use to import, manufacture, and distribute illicit and illegal drugs, the payment methods for buying and selling illicit drugs, and the methods drug traffickers use to avoid law enforcement detection, including disguising the source and illegal nature of drug proceeds.

### III. **SUMMARY OF PROBABLE CAUSE**

9. On November 5, 2020, in a restaurant parking lot in Carpinteria, California, CASTILLO-PENA sold approximately seven pounds of suspected methamphetamine to a Confidential Source working with the DEA. A sample of the suspected methamphetamine field tested positive for methamphetamine. Law enforcement subsequently arrested CASTILLO-PENA, searched CASTILLO-PENA, and found SUBJECT DEVICE 1 on his person. Law enforcement also searched CASTILLO-PENA's car and found SUBJECT DEVICE 2 and a Jennings J22, .22 caliber pistol, bearing serial number 503052, loaded with five rounds of .22 caliber ammunition.

## IV. STATEMENT OF PROBABLE CAUSE

10. Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

### A. Background Investigation

11. In August 2020, CS-1, who is cooperating with Santa Barbara County Sheriff's Office, provided law enforcement with the phone number for D.R., who has connections to "Cesar."[1] CS-1 stated that "Cesar" is a multi-pound methamphetamine drug trafficker who is associated with an unknown gang in the San Bernardino County area and responsible for trafficking drugs to other gang members in Santa Barbara County. Law enforcement provided that phone number to CS-2,[2] who is working at the direction of the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF").

12. On or about August 12, 2020, CS-2 contacted D.R. to inquire about purchasing one-half pound of methamphetamine and, over the course of the next few days, they negotiated over

---

[1] CS-1 is currently working for consideration in reduction of charges for narcotics-related charges. CS-1 has been previously convicted of the following: two felonies for possession of a controlled substance for sales, two felonies for assault with deadly weapon: possibly great bodily injury, misdemeanor for trespassing/occupying property without consent, misdemeanor for possessing/selling a switch-blade knife, misdemeanor for assault, misdemeanor for possession of a controlled substance, and a misdemeanor for destroying/concealing evidence.

[2] CS-2 is working for consideration in sentencing for narcotics related charges. CS-2 has been previously convicted of the following: misdemeanor for obstruction of a public officer, misdemeanor for inflicting corporal injury on a spouse/cohabitant, and a misdemeanor for driving with a suspended license.

4

prices and quantity.  On August 15, 2020, D.R. informed CS-2 of "Cesar's" contact number, and told CS-2 that D.R.'s supplier ("Cesar") was waiting for CS-2's call.

13. On or about August 15, 2020, CS-2 contacted "Cesar" and negotiated to purchase approximately one pound of methamphetamine from "Cesar" on August 18, 2020.

### B. CASTILLO-PENA Sells Approximately 354.2 Grams of Methamphetamine to CS-2 Via a Courier on August 18, 2020

14. On or about August 18, 2020, CS-2 drove to a predetermined location in Goleta, California, to purchase the agreed-upon methamphetamine from "Cesar."  An individual who identified himself as "Eric" arrived and sold approximately 354.2 grams of methamphetamine to CS-2.[3]  "Eric" drove a black Nissan Altima, with California license plate number 8TCY588, to the controlled buy.  Law enforcement ran the plate number through a law enforcement database and learned that the Nissan Altima was registered to CASTILLO-PENA.

### C. CASTILLO-PENA Sells Approximately 18 Ounces of Methamphetamine to CS-2 on September 15, 2020

15. On or around September 12-15, 2020, CS-2 communicated with CASTILLO-PENA to coordinate the purchase of approximately one pound of methamphetamine from CASTILLO-PENA in exchange for $3,200.[4]  CASTILLO-PENA and CS-2 agreed that the drug sale would take place on September 15, 2020, in Carpinteria, California.

---

[3] Laboratory results confirm that the substance constituted approximately 354.2 grams of pure methamphetamine.

[4] Additionally, CASTILLO-PENA and CS-2 agreed that CASTILLO-PENA would provide CS-2 with approximately an extra two ounces

5

16. On September 15, 2020, at approximately 8:45 p.m., CASTILLO-PENA texted CS-2 the location for the drug sale in Carpinteria, California. At approximately 9:15 p.m., CS-2 received both a text and call from CASTILLO-PENA, stating that CASTILLO-PENA had arrived to the designated location. Law enforcement conducting surveillance of the location saw a car arrive to the location and park directly next to the passenger side of CS-2's car.[5] Law enforcement saw CASTILLO-PENA, who was wearing a face mask, exit his car, grab an unseen item from his car, and approach CS-2's vehicle. A few minutes later, law enforcement saw CASTILLO-PENA, who was no longer wearing a face mask, close the passenger door of CS-2's vehicle and walk across the parking lot towards the 7-11 convenience store.[6] Surveillance saw CASTILLO-PENA put on his face mask and walk into the 7-11 convenience store.

17. After the controlled buy was completed, law enforcement searched CS-2 and recovered approximately 18 ounces of suspected methamphetamine inside of several layers of plastic and paper bags.[7] CS-2 told law enforcement that CASTILLO-PENA placed a brown paper bag on CS-2's passenger seat upon opening

---

of methamphetamine that was owed to CS-2 from the previous controlled purchase between CS-2 and "Eric" on August 18, 2020.

[5] Investigators conducted further investigation on this vehicle and learned that it had a Vehicle Identification Number of 3GCPCSE02DG317242 and that it was registered to Lucia Valle Sotelo or Ramon Reyna at 7689 Bonnie St., San Bernardino, CA 92410.

[6] Law enforcement identified CASTILLO-PENA by referencing CASTILLO-PENA's California Driver's License with video footage taken from CS-2's vehicle, in which CASTILLO-PENA was no longer wearing a face mask, and a positive identification by CS-2.

[7] Laboratory results are currently pending.

the passenger door.  CS-2 also stated that he/she proceeded to count the money for CASTILLO-PENA and then handed the money to CASTILLO-PENA, who placed it in his pocket.  The CS stated that he/she then looked inside the brown paper bag to confirm that the methamphetamine was there and then placed the brown paper bag to the side.  The CS stated that he/she then had a narcotics-related conversation with CASTILLO-PENA for a few minutes afterward.

### D. CASTILLO-PENA Sells Approximately Two Pounds of Methamphetamine to CS-2 on October 14, 2020

18. Between October 8-14, 2020, CS-2 communicated with CASTILLO-PENA to coordinate the purchase of approximately two pounds of methamphetamine from CASTILLO-PENA in exchange for $6,200 on October 14, 2020.

19. On October 13, 2020, at approximately 6:03 p.m., CS-2 placed a recorded and monitored call to CASTILLO-PENA.  During the call, CASTILLO-PENA informed CS-2 that he would be staying in Carpinteria that evening and that he had the two pounds of methamphetamine with him for the deal the following day.

20. On October 14, 2020, between 11:43 a.m. and 12:17 p.m., CS-2 placed recorded and monitored recorded calls with CASTILLO-PENA, and coordinated to meet at Taco Bell, located at 140 N. Fairview Ave., Goleta, California.

21. At approximately 12:21 p.m., law enforcement observed a car pull into the Taco Bell parking lot and park to the west of CS-2's car, facing south.  At approximately 12:25 p.m., law enforcement observed CASTILLO-PENA exit the car holding a gray

colored plastic shopping bag in his left hand. Law enforcement then saw CASTILLO-PENA open the front passenger door of CS-2's car and enter. During this time, the front passenger door of CS-2's car remained ajar.

22. At approximately 12:25 p.m., law enforcement observed CASTILLO-PENA exit the front passenger seat of CS-2's car, and law enforcement observed that CASTILLO-PENA no longer had the gray plastic shopping bag. Law enforcement then observed CASTILLO-PENA enter his car.

23. After the controlled buy was completed, law enforcement searched CS-2 and recovered approximately 980.1 gross grams of suspected methamphetamine inside two clear Ziploc bags within a gray colored plastic shopping bag.[8] CS-2 told law enforcement that CASTILLO-PENA handed the plastic shopping bag holding the suspected methamphetamine over to CS-2 once he got inside CS-2's car. CS-2 stated that he/she then looked inside the bag and confirmed that the suspected methamphetamine was there, before placing it in the back of the CS-2's car. CS-2 stated that he/she then handed the money over to CASTILLO-PENA, who proceeded to count the money and hold onto it in his hands.

---

[8] Laboratory results are currently pending.

Following the deal and prior to meeting with law enforcement, between approximately 12:26 p.m. and 12:34 p.m., CS-2 was unobserved due to traffic patterns. During this time, law enforcement remained in communication with CS-2 who kept them informed of his/her whereabouts. Additionally, law enforcement reviewed video footage from inside the CS' vehicle and confirmed that the CS did not make any stops during the time they left the narcotics deal location and when they met with law enforcement.

The CS stated that he/she then had a narcotics-related conversation with CASTILLO-PENA for a few minutes afterward.

### E. Law Enforcement Conducts Buy Bust of CASTILLO-PENA on November 5, 2020 and Seize Approximately 7 Pounds of Suspected Methamphetamine, a Loaded Gun, and the SUBJECT DEVICES

24. Between November 1 and November 5, 2020, CS-2 communicated with CASTILLO-PENA to coordinate the purchase of approximately seven additional pounds of methamphetamine.

25. On November 5, 2020, CS-2 and CASTILLO-PENA agreed to meet in a McDonald's parking lot, located at 1115 Casitas Pass Rd. in Carpinteria, California, to conduct the drug sale. At approximately 1:10 p.m., law enforcement saw CASTILLO-PENA arrive in a white car and park next to CS-2's car. Law enforcement saw CASTILLO-PENA exit his car, open the trunk of his car and remove a box, and place the box on the rear seat of CS-2's car. Law enforcement then saw CASTILLO-PENA enter the front-passenger side of CS-2's car to speak to CS-2. At this time, law enforcement moved in and arrested CASTILLO-PENA.

26. Law enforcement searched the rear seat of CS-2's car and found seven packages containing suspected methamphetamine. Each package weighed approximately one pound. Law enforcement conducted a field test of the substance inside one of the seven packages, and the substance tested presumptively positive for methamphetamine.

27. During a search incident to arrest, law enforcement found SUBJECT DEVICE 1 on CASTILLO-PENA's person. Law enforcement also found SUBJECT DEVICE 2 and a Jennings J22 .22

caliber pistol, bearing serial number 503052, loaded with five rounds of .22 caliber ammunition, in CASTILLO-PENA's car.

## V. TRAINING AND EXPERIENCE ON DRUG OFFENSES

28. Based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

    a. Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package, and deliver the drugs and launder the drug proceeds. Drug traffickers often travel by car, bus, train, or airplane, both domestically and to foreign countries, in connection with their illegal activities in order to meet with co-conspirators, conduct drug transactions, and transport drugs or drug proceeds.

    b. Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale and distribution of illegal drugs. The aforementioned records are often maintained where the drug trafficker has ready access to them, such as on their cell phones and other digital devices.

    c. Communications between people buying and selling drugs take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices. This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal. In

addition, it is common for people engaged in drug trafficking to have photos and videos on their cell phones of drugs they or others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

        d.    Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices. Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices, including in the form of calendar entries and location data.

        e.    Individuals engaged in the illegal purchase or sale of firearms and other contraband often use multiple digital devices.

## VI. TRAINING AND EXPERIENCE ON FIREARMS OFFENSES

29. From my training, personal experience, and the collective experiences related to me by other law enforcement officers who conduct who conduct firearms investigations, I am aware of the following:

        a.    Persons who possess, purchase, or sell firearms generally maintain records of their firearm transactions as items of value and usually keep them in their residence, or in places that are readily accessible, and under their physical control, such in their digital devices. It has been my experience that prohibited individuals who own firearms illegally will keep the contact information of the individual who is supplying firearms to prohibited individuals or other

11

individuals involved in criminal activities for future purchases or referrals.  Such information is also kept on digital devices.

   b. Many people also keep mementos of their firearms, including digital photographs or recordings of themselves possessing or using firearms on their digital devices.  These photographs and recordings are often shared via social media, text messages, and over text messaging applications.

   c. Those who illegally possess firearms often sell their firearms and purchase firearms.  Correspondence between persons buying and selling firearms often occurs over phone calls, e-mail, text message, and social media message to and from smartphones, laptops, or other digital devices.  This includes sending photos of the firearm between the seller and the buyer, as well as negotiation of price.  In my experience, individuals who engage in street sales of firearms frequently use phone calls, e-mail, and text messages to communicate with each other regarding firearms that the sell or offer for sale.  In addition, it is common for individuals engaging in the unlawful sale of firearms to have photographs of firearms they or other individuals working with them possess on their cellular phones and other digital devices as they frequently send these photos to each other to boast of their firearms possession and/or to facilitate sales or transfers of firearms.

   d. Individuals engaged in the illegal purchase or sale of firearms and other contraband often use multiple digital devices.

## VII. TRAINING AND EXPERIENCE ON DIGITAL DEVICES

30. As used herein, the term "digital device" includes the SUBJECT DEVICES.

31. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

   a. Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet. Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time. Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

   b. Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device. That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them. For example, recoverable

13

data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

        c.    The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it. For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

        d.    Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

    32.    Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it can take a substantial period of time to search a digital device for many reasons, including the following:

        a.    Digital data are particularly vulnerable to inadvertent or intentional modification or destruction. Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which

may take substantial time, particularly as to the categories of electronic evidence referenced above.

   b. Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

  33. The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

   a. Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

   b. In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the

15

opportunity to use a biometric unlock function even on an enabled device may exist for only a short time. I do not know the passcodes of the devices likely to be found in the search.

   c. The person who is in possession of a device or has the device among his or her belongings is likely a user of the device. Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress Cesar CASTILLO-PENA's thumb- and/or fingers on the device(s); and (2) hold the device(s) in front of Cesar CASTILLO-PENA's face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

 34. Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

/ / /

/ / /

/ / /

## VIII.   CONCLUSION

35. For all of the reasons described above, there is probable cause to believe that CASTILLO-PENA has committed a violation of 21 U.S.C. § 841(a)(1): Possession with Intent to Distribute a Controlled Substance. There is also probable cause that the items to be seized described in Attachment B will be found in a search of the SUBJECT DEVICES described in Attachment A.

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this **6th** day of
**November**, 2020.

*Patricia Donahue*
_____
PATRICIA DONAHUE
UNITED STATES MAGISTRATE JUDGE